**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **RUTH M. LAWSON**, | * |
| Plaintiff, | * |
| v. | *   **Civil No. RWT   03-CV-884** |
| **UNITED STATES OF AMERICA** | * |
| Defendant. | * |

**MEMORANDUM OPINION**

On September 28, 2006, this Court issued an opinion and order awarding damages to plaintiff Ruth M. Lawson, a military dependent, for injuries found to have been caused by the medical negligence of the defendant's employees at the Malcolm Grow Medical Center at Andrews Air Force Base where her husband, Major Erick J. Lawson, was stationed. In that opinion, this Court preliminarily rejected the defendant's argument that there should be an offset against the judgment to reflect the value of such anticipated future benefits from the Tricare/CHAMPUS[1] ("Tricare") program that are also covered by the damages award of this Court, reasoning that such benefits were speculative and the benefits may never be received. Lawson v. U.S., 454 F. Supp.2d 373, 415 (D. Md. 2006). Nevertheless, this Court invited the defendant to submit a Motion to Alter or Amend the Judgment to address the potential "double-dipping" that defendant alleged could occur if Mrs. Lawson were to receive such benefits. Id. In response, the defendant filed two Motions to Alter or Amend, which were opposed by Mrs. Lawson. On January 29, 2007, the Court held a hearing on

---

[1] CHAMPUS is an acronym for the "Civilian Health and Medical Program of the Uniformed Services." 32 C.F.R. § 728.2(c) (2006).

these motions at which time both sides presented arguments and substantive evidence in the form of expert witness testimony.

**I.**

The defendant's first Motion to Alter or Amend [Paper No. 62] requests a setoff of $637,083 representing the amount of the anticipated future Tricare program benefits that it contends Mrs. Lawson will receive that are encompassed within the Court's damages award.

To support its position, the defendant primarily relies on the decision in <u>Burke v. United States</u>, 605 F. Supp. 981 (D. Md. 1985), a case in which Judge James R. Miller, Jr. of this Court reduced an award for future medical and hospital expenses by 75%. The rationale of that case is sound, but inapposite here. In <u>Burke</u>, the victim's benefits were virtually certain because her spouse had already retired from the military and she was entitled to, and then receiving, vested retiree benefits as his dependent. Moreover, the <u>Burke</u> court expressly assumed that the defendant would "provide <u>all</u> necessary medical and hospital care" for the plaintiff. <u>Id.</u> at 992 (emphasis added). In contrast, Major Lawson will have to remain in the Air Force until 2012 before he will be eligible for retirement benefits, benefits that he may never receive if he leaves the Air Force in the next five years. Furthermore, for reasons explained below, it is extremely doubtful that any post-retirement Tricare benefits, even if Major Lawson were to achieve retiree status, would provide "all necessary medical and hospital care" to Mrs. Lawson. <u>Id</u>.

The Court held a hearing to allow the defendant to develop further its arguments so that the Court could determine whether an offset would be appropriate under the facts of this case. At the January 29, 2007 hearing, the defendant responded to questions by the Court and also presented expert testimony to clarify the scope of the Tricare benefits and specifically the anticipated future

benefits for which the defendant sought an offset. The defendant called Michael F. Kottyan, a Health Care Policy Analyst with the Office of the Assistant Secretary of Defense, as an expert witness. Mr. Kottyan candidly conceded the speculative nature of any possible future benefits available to Mrs. Lawson:

> MR. KOTTYAN: I cannot speculate as to what future Tricare payments will be made on behalf of Mrs. Lawson.
>
> PLAINTIFF'S COUNSEL: You're telling the court that you can't speculate today as to how much Tricare will pay for Mrs. Lawson over her lifetime; that would be sheer speculation?
>
> MR. KOTTYAN: That is correct.

Hearing Transcript at 31: 13-19.[2]

This testimony enhanced, rather than diminished, the speculative nature of the future Tricare benefits to which Mrs. Lawson may, if ever, be entitled. It is still unclear whether Major Lawson will remain in the Air Force until eligibility for retirement, whether the Lawsons will remain married such that Mrs. Lawson will be eligible to receive Tricare benefits for the balance of her life, and whether the benefits provided by the Air Force will continue at the current level. By defendant's own admission, the scope and duration of the Lawson's future Tricare benefits are speculative at best.

Another important aspect of possible future Tricare benefits brought out at the January 29,

---

[2] Mr. Kottyan also testified to the limitations of the Tricare program, particularly with respect to co-pays:

> PLAINTIFF'S COUNSEL: And you would agree [that Mrs. Lawson is] not reimbursed for the co-pays that she has to pay for to obtain certain medications that are not available on base; correct?
>
> MR. KOTTYAN: Correct

Hearing Transcript at 26: 17-20.

2007 hearing is the effect on such benefits in the event that Major Lawson does retire from the Air Force and thereafter obtains other employment. Major Lawson will still be a relatively young man in 2012, when he is eligible to retire from the Air Force. There is a high-probability, particularly given the ill health of his wife, that he will seek other employment after retirement. Mr. Kottyan testified, in response to questions by the Court, that Tricare would only be the payer of last resort should Major Lawson retire, become eligible for Tricare benefits, and then obtain employment that includes medical insurance.:

> .   THE COURT: I just have one question for the witness. If you assume that plaintiff's husband does in fact stay in the military until he's eligible to retire and then does retire and then goes to work for a great corporation that has a great medical plan, a Blue Cross/Blue Shield best-product-you-can-get like I have. If I understood you correctly, in that instance Tricare-Champus would only be backup coverage to the new coverage being provided by, say, Blue Cross/Blue Shield; is that right?
>
> MR. KOTTYAN: Yes, Your Honor. With the exception of services and benefits provided by Medicaid, Tricare is a secondary payer to other health insurers.
>
> THE COURT: So its responsibility or liability would go substantially down if that were to happen; is that right?
>
> THE WITNESS: Yes.

Thus, even if Major Lawson were to reach retirement in the Air Force and then seek other employment, as is a typical practice for young military retirees, any private health insurance that would be provided through Major Lawson's subsequent employment would be the primary provider of benefits to Mrs. Lawson, not Tricare, and any such benefits would be a classic collateral source, the benefit of which would not inure to the benefit of the defendant. U.S. v. Mays, 806 F.2d 976, 977 (10th Cir. 1986); Motor Vehicle Admin. of the Md. Dep't of Transp. v. Seidel Chevrolet, Inc., 326 Md. 237, 253 (Md. 1992)(noting that the collateral source law in Maryland permits "an injured person to recover in tort the full amount of his provable damages regardless of the amount of

4

compensation which the person has received for his injuries from sources unrelated to the tortfeasor").[3]

The Court therefore concludes that while in some cases involving reasonably certain future benefits there may be a legal basis for an offset, there is no adequate factual basis for such an offset in this case. Other district courts to consider this issue have concluded that although a lump-sum award may not be an ideal remedy, an offset for speculative future benefits is not a proper way to avoid windfalls. Powers v. U.S., 589 F. Supp. 1084, 1109-09 (D.Conn. 1984); see also Lozada for and on Behalf of Lozada v. U.S., 140 F.R.D. 404, 416 (D.Neb. 1991). Because the Government's testimony has enhanced, not diminished, the Court's concern as to the speculative nature of the anticipated future benefits that Tricare might provide, and because it is clear that Tricare will likely be liable for retiree benefits, if any, only as the payer of last resort, the Court will deny the defendant's first Motion to Alter or Amend the Judgment. In short, just as a plaintiff is required to prove damages with reasonable certainty, no less should be required of a defendant seeking an offset, something the defendant has failed to do. Reilly v. U.S., 863 F.2d 149, 163 (1st Cir. 1998)("the district court could not be expected to reduce the award without (i) knowing the amount by which the government contended that the damages should be reduced, and (ii) being afforded some proof of that sum").

---

[3] Under the Federal Tort Claims Act, the federal courts are required to apply to the United States the tort law of the state in which the act or omission occurred. 28 U.S.C. § 1346(b) (2006); Richards v. U.S., 369 U.S. 1, 11 (1962). Hence this Court applies Maryland law to this case.

**II.**

The defendant's second Motion to Alter or Amend [Paper No. 61] proposes, as an alternative to an offset, that the award of $3,724,423 of "Future Care Costs" not be paid to Mrs. Lawson, but rather be placed in a reversionary trust in which the United States would maintain an interest in the event of Mrs. Lawson's death prior to exhaustion of the award. Through this trust, the United States would also seek to avoid alleged "double-dipping" by Mrs. Lawson.

There are five reasons why the Court cannot grant this second motion. First and foremost, it is the province of the legislature to fashion unique remedies, such as compelling the creation of a reversionary trust. Frankel v. Heym, 466 F.2d 1226, 1228-1229 (3rd Cir. 1972) ("[w]e agree with the district court that in administering the legislation in question a district court should not make other than lump-sum money judgments unless and until Congress shall authorize a different type of award"). There is nothing in the Federal Tort Claims Act ("FTCA") or other federal law that specifically authorizes or requires a court to direct the creation of a trust. The result arguably may be a potential windfall to the plaintiff, but if it is, the proper remedy lies with Congress, and an amendment to the statute, and not with this Court.[4]

Second, and on a related note, the creation of a reversionary trust would create significant and unnecessary administrative burdens and attendant costs. Because it would not be appropriate to have the defendant serve as both the residuary beneficiary of the trust and the administrator, the judicial branch likely would be left to act as the holder of the funds or a private entity would be required to administer the trust. Thus the creation a trust would cause either or both: (1) additional

---

[4] The FTCA does, however, provide that the government is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674 (2006). For a discussion of the effect of this provision where trusts are authorized by state law, see infra pp.9-10.

cost and burdens to set-up and administer the trust fund, and (2) a *de facto* reduction in the amount of damages received by Mrs. Lawson because a portion of her award would have to be used for the cost of administering the trust. The former is disfavored under the law, particularly in the administration of the FTCA, and the latter would result in an inequitable solution. Hull by Hull v. U.S., 971 F.2d 1499, 1504-1505 (10th Cir. 1992); Kosak v. U.S., 465 U.S. 848, 868 (1984)(requiring courts to decide claims under the FTCA "with justice and equity both to the Government and to the claimants")(Stevens, J., dissenting).

Third, a reversionary trust "might be useful when there is great uncertainty about the victim's life expectancy." Nemmers v. U.S., 795 F.2d 628, 636 n.4 (7th Cir. 1986). This approach is used to avoid windfalls - that is, to avoid unjust enrichment to a tort victim's estate in the event that the tort victim dies prematurely. Hill v. U.S., 81 F.3d 118, 120 (10th Cir. 1996).[5] In situations where the victim's life expectancy is uncertain, the creation of a trust may be appropriate. However, in this case there was no testimony to suggest that there is any uncertainty with respect to Mrs. Lawson's life expectancy. Thus a trust is not required to offset any potential windfalls that could result due to uncertainty as to life expectancy.

Fourth, even if the Court were to consider fashioning such a remedy, it would only be proper where the remedy is in the plaintiff's best interest. Hull, 971 F.2d at 1505; Calva-Cerqueira v. U.S.,

---

[5] The Hill case is readily distinguishable from Mrs. Lawson's situation. First and foremost, the parties in Hill had already agreed to the creation of a trust for the entire award due to the minor plaintiff. Thus the Tenth Circuit focused on whether a *reversionary trust* was appropriate. The Hill court concluded that "the district court can create a reversionary trust that would approximate the result contemplated by the [state law]." Id. at 121. In so doing, the Tenth Circuit sought to comply with the FTCA and treat the Government "in the same manner and to the same extent as a private individual under like circumstances." Id. at 120. It thus allowed the District Court to fashion a remedy that approximated the remedy required for private litigants under Colorado state law. Id. at 121. For a discussion of Maryland law as it applies to Mrs. Lawson's case, see infra pp.9-10.

281 F. Supp.2d 279, 300-01 (D. D.C. 2003); Wyatt v. U.S., 944 F. Supp. 803, 804 (E.D. Mo. 1996).

Most instructive to the Court on the question of whether the trust is in Mrs. Lawson's best interest is her lack of consent. The first page of her Opposition states, "Plaintiff and her husband hereby expressly decline a reversionary trust." Opposition at 1. Courts "routinely reject requests for reversionary trusts where the injured party . . . objects to the trust and the defendant offers no evidence of the benefit to the injured party." Calva-Cerqueira, 281 F. Supp 2d at 300-301. The creation of the trust would not be in Mrs. Lawson's best interest because it would create an additional administrative burden for her in obtaining medical care. Further, the trust could have the undesired effect of restricting her care or her ability to obtain a second opinion. For example, if monies were withheld for a second opinion because Mrs. Lawson used a Tricare physician for a particular service, the trust administrator might deny payment for this second opinion as being a service already rendered. Mrs. Lawson would then have to pay out-of-pocket if she were to desire a second opinion. Given Mrs. Lawson's experiences in this case, it is understandable that she might desire a second opinion from a private out-of-network physician.

Additionally, the existence of the trust would possibly curtail Mrs. Lawson's use of private physicians, in favor of Tricare physicians or physicians in the Tricare network. The law expressly recognizes the right of the plaintiffs to choose their own physicians. Feely v. U.S., 337 F.2d 924, 935 (3dc Cir. 1964); Christopher v. U.S., 237 F. Supp. 787, 798-99 (E.D. Pa. 1965)(applying Maryland law and citing Feely for the plaintiff's right to select his medical care). By holding the bulk of her damages award in a trust, Mrs. Lawson could be denied the ability to easily and freely choose her future health care providers. As one appellate court to consider this same issue has noted:

> To force a plaintiff to choose between accepting public aid or bearing the expense of rehabilitation himself is an unreasonable choice. The plaintiff may not be satisfied with the

public facilities; he may feel that a particular private physician is superior; in the future, because of over-crowded conditions, he may not even be able to receive timely care. These are only a few of many considerations with which an individual may be faced in selecting treatment. The plaintiff's past use of the government facilities does not ensure his future use of them. He will now have the funds available to him to enable him to seek private care. He should not be denied this opportunity.

Feely, 337 F.2d at 924, 935.

Fifth, the creation of this trust is neither warranted not required under Maryland law. The defendant cites to § 11-109(c) of the Maryland Courts & Judicial Proceedings Article which gives a court discretionary authority to order that "all or part of the future economic damages portion of the award be paid in the form of annuities or other appropriate financial instruments." The Court of Appeals of Maryland has reinforced the discretionary nature of § 11-109 in the only known case to discuss this provision:

> We start by pointing out that § 11-109 does not, as appellants' argument implies, require a court to permit the periodic payment of future economic damages. Section 11-109(c)(1) states that a court may order all or part of an award of such damages to be discharged through periodic payments. It is a discretionary call on the court's part, which is subject to appellate review only in terms of whether the court abused its discretion.

Kent Village Assocs. Joint Venture v. Smith, 104 Md. App.507, 526 (1995)(emphasis added).

Moreover, § 11-109(c) specifically states that payments must be "consistent with the needs of the plaintiff," thus triggering an analysis of whether the trust would be in the plaintiff's best interest. MD. CODE ANN., CTS.& JUD. PROC. § 11-109(c)(2002). The Court again finds that it is not in Mrs. Lawson's best interest to have her damages award tied up in a trust fund. Requiring Mrs. Lawson to access a trust fund for each medical expense could result in a laborious, time-consuming process. The last thing that Mrs. Lawson needs at this point in her life is an additional administrative burden to receiving the care that she needs and deserves. Further, the defendant has

9

not met its burden and has not provided a single explanation as to how the creation of a trust would be in Mrs. Lawson's best interest. Calva-Cerqueira, 281 F. Supp.2d at 300-301; see also Wyatt v. U.S., 944 F. Supp. at 804. Without the plaintiff's consent, and without evidence that its creation would be in the plaintiff's best interest, directing the creation of a reversionary trust would be unjust. Therefore, the Court declines to exercise whatever discretion §11-109 might give to it to mandate the creation of a reversionary trust.[6]

Under the FTCA, "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674 (2006). Thus the Court is bound by Maryland law in fashioning the appropriate remedy in this case. As noted above, the award of an annuity or other appropriate financial instrument is discretionary, not mandatory, under Maryland law. In Fonseca v. U.S., a federal court did award a reversionary trust over the objections of the plaintiff. No. 01-C-0544, 2007 WL 518429, at *2 (E.D.Wis. Feb. 14, 2007). However, in that case the court concluded that a reversionary trust was not only allowed under Wisconsin state law, it was required. Id. ("in the present case, I am creating a reversionary trust based not on my inherent power to do so to serve [the plaintiff's] best interest but because the FTCA's like circumstances requirement requires me to do so"). Because the creation of a reversionary trust is not required under Maryland law, the Court

---

[6] It is also questionable whether § 11-109 authorizes a court to mandate the creation of a reversionary trust as proposed by the defendant. All that § 11-109 does is authorize, but not require, that "all or part of the future economic damages portion of the award be paid in the form of annuities or other appropriate financial instruments, or that it be paid in periodic or other payments consistent with the needs of the plaintiff. . . ." MD. CODE ANN., CTS.& JUD. PROC. § 11-109(c)(1). Nowhere in this language does the statute authorize the creation of a reversionary trust, but merely "annuities or other appropriate financial instruments." Id. The Court questions whether this statute was intended to govern the creation of reversionary trusts. However, the Court need not reach or decide this issue because it has declined to exercise its discretion under §11-109.

does not run afoul of the "like circumstances" requirement of the FTCA by declining to create such a remedy. 28 U.S.C. § 2674 (2006).  In this way, the Court is treating the defendant as it would any other litigant under similar circumstances.

Accordingly, the defendant's motions will be denied by separate order.


 3/30/07                                                                          /s/
DATE                                                              ROGER W. TITUS
                                                          UNITED STATES DISTRICT JUDGE